IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff, vs. RICHARD D. LACY, JR., K.L., a minor, and JACOB LACY, Defendants. | No. C14-0051 REPORT AND RECOMMENDATION |

On the 8th day of April 2015, this matter came on for Evidentiary Hearing. Defendant Richard D. Lacy, Jr. appeared personally and was unrepresented by counsel. Defendant Jacob Lacy appeared personally and was unrepresented by counsel. Defendant K.L., Richard's seven-year-old son, did not appear. No one appeared on behalf of Plaintiff Metropolitan Life Insurance Company.

## I. PROCEDURAL HISTORY

On April 17, 2014, Plaintiff Metropolitan Life Insurance Company ("MetLife") filed a complaint in interpleader, seeking the Court's direction on the disposition of funds of a life insurance policy insuring the life of Richard D. Lacy, Sr.[1] On August 7, 2014, MetLife filed a motion asking that it be permitted to deposit the contested funds with the clerk of court, pending a resolution of the case. The motion was granted, and on September 17, 2014, MetLife deposited $33,908.00 with the clerk of court.

On November 26, 2014, the Court entered an Order establishing deadlines for completion of discovery and filing motions. On February 13, 2015, MetLife filed a

---

[1] The complaint was amended on August 27, 2014.

motion for entry of final decree of interpleader. Judge Edward J. McManus referred the case to me for a report and recommendation "on the matter of which claimant(s) are entitled to the remaining Plan Benefits." I then set the matter for an evidentiary hearing on April 8, 2015.

## II. RELEVANT FACTS

### A. Life Insurance

Richard D. Lacy, Sr. (whom I will refer to in this report as "Lacy") died on March 2, 2013. At the time of his death, Lacy was covered by a MetLife life insurance policy provided by his employer. In a beneficiary designation form, Lacy provided that his sons, Richard D. Lacy, Jr. ("Richard") and Jacob Lacy ("Jacob"), would each receive 40% of the benefit. The remaining 20% was designated to his grandson, who is identified in this action as K.L.[2]

From the insurance proceeds, MetLife paid a funeral home assignment in the amount of $10,068.25. MetLife paid Richard 40% of the remaining benefits. At the instant hearing, Richard testified that MetLife is holding 20% of the benefits in trust, until K.L. reaches age 21. The benefits which would otherwise have been paid to Jacob — 40% of the net benefits — were paid to the clerk of court pending a resolution of this case. Richard asserts that Jacob is disqualified from receiving any of Lacy's life insurance benefits due to the circumstances surrounding Lacy's death.

### B. Circumstances of Lacy's Death

Richard D. Lacy, Sr. died on March 2, 2013, after being choked by his son, Jacob, on February 24, 2013. He was 45 years old. The death certificate (Defendant's Exhibit 1) identifies Lacy's "immediate cause" of death as "anoxic encephalopathy" (lack of oxygen to the brain) and "manual strangulation." The death certificate also identifies

---

[2] K.L. is the son of Richard D. Lacy, Jr.

"other significant conditions contributing to death" as "acute alcohol intoxication and dilated cardiomyopathy." The "manner of death" was described as a "homicide."[3]

Lacy's mother, Joyce Ann Clark, testified that prior to his death, Lacy was working in "maintenance" at Goodwill. According to his mother, Lacy was a hard worker and never missed a day of work. Clark described Lacy as "very loving and caring, and he was just the heart of our family." Immediately prior to his death, Lacy was living in an apartment with his son, Jacob. According to Clark, Jacob and Lacy did not have a good relationship. Clark testified that Lacy obtained a prescription for "anxiety pills" because "Jacob was treating him so badly." Jacob testified that he and his father had lived together for "countless years."[4] According to Jacob, "we got along really good when he was sober." Jacob testified, however, that his father would become violent when he was drinking, resulting in "altercations."

On Sunday, February 24, 2013, Lacy and Jacob were together at the apartment they were sharing in Cedar Rapids. Jacob had attended a bachelor party the night before and did not arrive home on Sunday until approximately 1:00 p.m.[5] Also present were Cynthia Bruce (Jacob's cousin) and Sam Davis. Richard testified at the hearing that Cynthia and Sam were "flopping" on the couch at the apartment with Jacob's permission. Between

---

[3] It should be noted, however, that the other options available on the death certificate are "natural," "accident," "suicide," "pending investigation," and "could not be determined." Under these circumstances, the term "homicide" is likely intended to mean death at the hands of another person, without making any judgment with respect to criminal culpability.

[4] At the time of these events in February 2013, Jacob was a few weeks short of his 22nd birthday.

[5] In describing the facts, the Court has relied on a police report (Defendant's Exhibit 2) offered at the hearing by Richard. Generally, the police report would be inadmissible hearsay, but Jacob had no objection to its admission at the time of hearing. I note that the Exhibit consists of the first 15 pages of a 23-page report. Richard said he has no knowledge regarding the whereabouts or contents of the remaining 8 pages.

4:00 and 5:00 p.m., Richard went to the apartment to visit his father after having watched a NASCAR race on TV. According to Richard, Lacy and Jacob were "not getting along" at that time. Richard acknowledged that his father had been drinking, but denied that he was violent. Richard left after about 25 minutes.

Jacob later told officers that he had been arguing with his father "most of this last week" because Jacob was not working and his father was upset that he was not contributing to the payment of bills. That evening, Lacy and Jacob started arguing over a virus which had infected Lacy's laptop computer. According to Jacob, he was trying to fix the problem and his father "wouldn't let me do it." Jacob testified that Lacy "became belligerent and wouldn't listen and got angry." According to Jacob, Lacy had consumed an unusual amount of alcohol that day. Because his father kept his liquor in the kitchen, Jacob could not be precise, but he believes his father drank a whole pint of bourbon and then another half-liter of bourbon.

At some point, the dispute became physical. Jacob, who is with the military police in the Iowa National Guard, placed his father in a choke hold. Jacob told the police that he had received training in the technique. At some point, Lacy lost consciousness and Jacob "released and let him go." Jacob opined that "when that happens, they stay unconscious for a few minutes." When his father failed to regain consciousness after about five minutes, however, Jacob instructed Cynthia to call 911. A few minutes later, Cody Bruce (Cynthia's brother) and Justin Fritz (another cousin) appeared. There is some dispute whether Cynthia called 911, or Cody called 911. Neither party attempted to obtain a copy of the 911 recording.

Neither Cynthia Bruce nor Sam Davis — both of whom were present at the time of the incident — testified at the hearing. Similarly, neither Cody Bruce nor Justin Fritz — who coincidentally appeared at the apartment shortly after Lacy lost consciousness — appeared to testify at the hearing. Richard was called by Cody following the incident, and went directly to the hospital. Accordingly, he has no personal knowledge of the events

4

resulting in his father's death. The only person to testify who had personal knowledge of the events leading to Lacy's death was Jacob.

Jacob testified that as part of the police investigation, he signed a written statement. Neither party offered that statement as an exhibit at the time of hearing. However, the police report offered by Richard describes Jacob's account of the incident.:

> Jacob Lacy told me that he arrived home today at 141 33rd Ave SW Apt 29 at approximately 1300 hours. He was at a bachelor party the night before and had finally arrived home at that time. He further advised that he had been in a verbal argument with his father most of this last week and this was based on the fact that Jacob was not working at the present time and his father was upset that he was unable to help pay for bills. They also had an additional argument about a laptop computer which belongs to Richard Lacy; however, it had a virus on it and Jacob was attempting to fix it for him; however, Richard was not letting him do so. Jacob Lacy further advised that Richard Lacy had been drinking all day and he typically drinks whiskey. Jacob showed me earlier a half empty bottle of Five Star Whiskey. This was a one liter bottle which was half empty and an empty pint bottle of Five Star Whiskey. Jacob advised that Richard had drunk all of this on today's date.
>
> On today's date things escalated from a verbal argument to a physical one. Jacob stated at approximately 1700 hours his dad had swung at him; however, missed. After this happened, Jacob went back to his bedroom and hung out there for a while. He later came back out to the living room to watch TV. His father got irritated again when his cousin had ordered Chinese food for Davis, Cynthia and himself; however, did not order anything for Richard. This got Richard upset at which time Richard grabbed a black metal footstool and raised it above his head and threw it behind him, hitting the microwave stand and causing damage to it. Approximately ten minutes later Richard again got upset and picked up a bowling ball and raised it above his head, looking like he was going to throw it at Jacob who was lying on the couch. Jacob was able to stand

up and take the bowling ball away from his father and place it
down on the ground. Above five to ten minutes later Richard
asked Jacob for a cigarette; however, Jacob stated that he
smokes methanol and that his father smokes regular cigarettes
and therefore he wouldn't want any. Richard became irritated
at this and later attempted to take the remote control away
from Jacob in order to change the channel. When Jacob
wouldn't let him do this, Richard poked Jacob in his left eye
with his thumb and then wrapped his arm around his head and
began hitting him on the top of his head. Jacob stated that he
was on the couch at this time and was able to wiggle out from
underneath Richard; however, the two began wrestling. At
some point Jacob stated that he attempted to restrain his father
by placing him in a rear naked choke. Again, this is when
they were both on the living room floor. Jacob was on his
back and he was behind Richard with his legs wrapped around
his waist and his right arm around his neck. He applied
pressure with his right arm and let go as soon as he felt his
father go limp. When Jacob let go and got up, he noticed that
Richard was not breathing right. He stated that he saw that
Richard was gasping and gurgling for air, his eyes were shut,
and his mouth was shut. He opened up his father's mouth and
looked to see if anything was blocking his airway. When he
couldn't see anything he told Cynthia Bruce to call 911.
When she did so, the 911 dispatcher gave them instructions on
how to open up Richard's airway, which they did, and they
waited for officers to arrive.

Cedar Rapids Police Incident/Investigation Report (Defendant's Exhibit 2) at 10.

The police report also describes Cynthia's and Sam's version of the events:

I transported [Sam] Davis and [Cynthia] Bruce to the Cedar
Rapids Police Department for a more formal interview. This
was recorded in the interview rooms and the recording was
burned to a DVD and then placed in evidence. Both gave the
same sequence of events. They stated that Lacy had been
aggravating Jacob all day. They stated Lacy does this when he
is drunk. They stated Lacy had been drinking all day and was
extremely drunk and was repeatedly making punching motions
at Jacob, poking Jacob, and otherwise threatening to harm

> Jacob. Each time it would escalate into an argument. Lacy then would go sit down on a chair and fall asleep.
>
> Davis stated that when Lacy fell asleep he changed the channel on the TV and began playing XBOX. When Lacy woke up he began arguing about the TV remote and what show should be on the TV. Davis stated that Lacy got in Jacob·s face, grabbed him by the throat and put his fist in his face and they began wrestling. He stated Jacob was attempting to prevent Lacy from hitting him and Lacy was repeatedly swinging his fists at Jacob. Jacob then placed him in a choke hold until Lacy stopped fighting. He then let go of him. Lacy then rolled over face down onto a pillow. Davis stated Jacob then rolled him over and could hear that he was not breathing right and told Bruce to call 911. As dispatchers were providing instructions, Bruce was giving those to Jacob to perform the CPR on Lacy.

Cedar Rapids Police Incident/Investigation Report (Defendant's Exhibit 2) at 7.

As further evidence, Richard offered some "social media" postings by Hannah Elise Walton. At some point in time, Walton apparently had some sort of relationship with Jacob. According to Richard, Walton posted a message on Facebook on October 28, 2014 (approximately 19 months after these events), alleging Jacob had "murdered his dad." Inexplicably, however, Walton allegedly sent Richard's fiancé a text message the next day, asking "so what did Jacob do to u n Ricky for u not to like him? Just Jacob being Jacob lol." It is difficult for me to understand why Walton would accuse Jacob of murder one day, and then write to Richard's fiancé the next day asking what Jacob did "for you not to like him." The message ends: "lol" — laugh out loud. Jacob denies that he ever discussed this incident with Walton. I believe Walton's postings have no probative value.

Jacob called Ronnee Sue O'Brien to testify regarding Lacy's tendency to become violent after drinking. When Richard and Jacob were growing up, O'Brien lived in the same neighborhood as Lacy. According to O'Brien, Lacy would become "abusive and

7

violent" when he was drinking, and there were "numerous occasions" when Richard and Jacob came to O'Brien's house because Lacy was being abusive.

Lacy moved from the neighborhood following the flood in 2008. According to O'Brien, however, there was an incident in 2010 or 2011 when she was called by her adult son to pick him up at a trailer where Lacy was living in Marion. When O'Brien arrived, Jacob and her son were standing outside. According to O'Brien, Lacy "came out, was screaming and yelling." O'Brien told Lacy that she was "going to take Jake for the night, let things calm down, and then maybe tomorrow you guys can talk when you have sobered up."

According to Jacob, the police had been called several times because of his father's "violent nature." Jacob testified that these reports were "documented," but he did not produce any police reports regarding the prior incidents. Richard, who apparently lived with Lacy from 2010 to the beginning of 2012, testified that the police were not called by Jacob for a domestic dispute during that time. When asked whether he had ever seen his dad become violent after drinking, Richard responded: "Not really violent, nor hostile, but he would tell us like to leave him be, like it's his life, he can do whatever he wants." Richard emphasized that his father "wasn't hostile," but was "voicing his opinion."

Richard acknowledged an incident which occurred between him and his father at a party at the apartment on new year's eve of 2012. According to Richard, he and his father were "wrestling around, then I got serious and I punched my dad because I was mad, but it wasn't nothing on my dad's part." Richard admitted that he had struck his father in the face, resulting in a black eye, but claimed that "I'm the one who took it too far."

Jacob was not charged with any crime following this incident, and the police report dated July 29, 2013 identifies the case status as "closed/cleared."[6]

---

[6] Cedar Rapids Police Incident/Investigation Report (Defendant's Exhibit 2) at 1.

## III. DISCUSSION

In Iowa, a beneficiary of a life insurance policy is not entitled to benefits under the policy if the beneficiary "intentionally and unjustifiably" causes the death of the named insured.[7] A determination of whether a beneficiary is disqualified from receiving benefits for this reason must be shown by a preponderance of the evidence in a proceeding separate from any criminal proceeding.[8] As applied to the facts in this case, Richard has the burden of proving by a preponderance of the evidence that Jacob "intentionally and unjustifiably" caused their father's death.

The courts have had little need to address the Iowa felonious death statute. In *Salak v. Protective Life Ins. Co.*, 19 F. Supp. 2d 953 (S.D. Iowa 1998), the Court addressed the disposition of life insurance proceeds after a woman killed her husband and then killed herself. In that case, however, it was undisputed that the woman had "intentionally and unjustifiably" taken her husband's life. The issue in *Salak* was whether the benefits would pass to the contingent beneficiaries, who had apparently been previously designated by the wife. In the instant case, however, MetLife asserts in its amended complaint that if Jacob is disqualified from receiving benefits, then 2/3 of the remaining benefits would be payable to Richard and 1/3 would be payable to K.L. Neither Richard nor Jacob contest that assertion.

---

[7] "A named beneficiary of a bond, life insurance policy, or any other contractual arrangement who intentionally and unjustifiably causes or procures the death of the principal obligee or a person upon whose life the policy is issued or whose death generates the benefits under any other contractual arrangement is not entitled to any benefit under the bond, policy, or other contractual arrangement, and the benefits become payable as though the person causing death had predeceased the decedent." Iowa Code § 633.535(3).

[8] "A determination under § 633.535 may be made by any court of competent jurisdiction by a preponderance of the evidence separate and apart from any criminal proceeding arising from the death." Iowa Code § 633.536.

It is undisputed that Jacob "caused" Lacy's death by placing him in a choke hold. To be disqualified for the receipt of benefits, however, the beneficiary must "intentionally and unjustifiably cause" the insured's death. Not surprisingly, neither Richard nor Jacob have submitted any legal authority on what constitutes "intentionally and unjustifiably" under these circumstances. Cases from other jurisdictions hold, however, that a beneficiary is not disqualified from receiving benefits if he acts in self defense. *See generally, Killing of Insured By Beneficiary as Affecting Life Insurance or its Proceeds*, 27 A.L.R. 3d 794 (1969).

Here, Jacob and the other two witnesses to the incident have consistently claimed that Lacy was the aggressor. Richard believes that is not true, but he offers no evidence to support his suspicion. This is not a criminal case and Richard is not required to prove Jacob's "guilt" beyond a reasonable doubt, but Richard does have the burden of proving by a preponderance of the evidence that Jacob "intentionally and unjustifiably caused the death" of their father. I believe he is unable to meet his burden of proof in that regard.

There is evidence to support a finding that Lacy became abusive and violent when he was drinking. Ronnee O'Brien, a former neighbor of Lacy, testified that there were numerous occasions when Richard and Jacob came to her house because Lacy was being abusive. Richard testified that his father was "not really violent" when he had been drinking, but would tell the boys to leave him be and "he could do whatever he wants." Richard admitted he had at least one violent altercation with his father.

Richard acknowledged that when he went to the apartment late in the afternoon on February 24, his father had been drinking. Richard testified that his father and his brother were "not getting along" at that time. Following the incident, Jacob gave a detailed statement to the police describing Lacy's aggression. The only other witnesses to the incident, Cynthia and Sam, gave statements which were consistent with Jacob's version of the events.

Jacob is a member of the military police with the Iowa National Guard, and has apparently been trained in the proper use of a choke hold as a restraint technique. Tragically, Jacob's application of a choke hold in this case resulted in his father's death. However, the death certificate also identified "acute alcohol intoxication and dilated cardiomyopathy" as significant contributing conditions to Lacy's death. In any event, Richard has failed to produce any evidence that Jacob "intentionally" caused their father's death. Instead, the only witness at the hearing having personal knowledge of the incident, Jacob, testified that he acted "justifiably," *i.e.*, in self defense. The statements given by Cynthia and Sam immediately following the incident support Jacob's version of the events.

In summary, Richard claims that because Jacob caused the death of their father, he should be disqualified from receiving benefits under the life insurance policy. Iowa law provides, however, that a beneficiary is disqualified only if he "intentionally and unjustifiably causes" the death of the named insured. Richard is unable to prove by a preponderance of the evidence that Jacob intentionally and unjustifiably caused their father's death. Accordingly, I believe Jacob is not disqualified from receiving the life insurance benefits, and the clerk of court should be directed to pay the remaining proceeds to Jacob.

## IV. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion for Entry of Final Decree of Interpleader (docket number 20) filed by MetLife be **GRANTED**, and the Clerk of Court directed to pay the insurance proceeds deposited with the Court to Jacob Lacy. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need*

*to rule on the objections."* Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on April 8, 2015.

DATED this 15th day of April, 2015.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA